UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. SLATER et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LAURA MORTON et al.,<br><br>Defendants. | Case No.: 3:17-CV-1795-CAB-NLS<br><br>ORDER GRANTING MOTION TO DISMISS COUNTER-CLAIM<br><br>[Doc. No. 12] |

On March 9, 2018, Plaintiffs and Counter-Defendants Michael J. Slater, Clifford Boro, Raymond Watt, and Entry Ventures, Inc. (hereinafter collectively "Slater") filed a motion to dismiss the Fourth Counter-Claim for fraud filed by Defendants and Counter-Plaintiffs Laura Morton and Laura Morton Management, Inc. (hereinafter collectively "Morton"). [Doc. No. 12.] On April 4, 2018, Morton filed an opposition to the motion. [Doc. No. 16.] On April 11, 2018, Slater filed a reply. [Doc. No. 21.] For the reasons set forth below, the motion to dismiss the Fourth Counter-Claim is **GRANTED WITH LEAVE TO AMEND.**

BACKGROUND

On September 5, 2017, Slater filed a complaint for declaratory relief and money had and received. [Doc. No. 1.] In the complaint, Slater generally alleges that the parties had been in negotiations to work on a book project, but that project was cancelled and no

1

contract was formed. When Morton threatened to sue Slater for breach of contract, Slater filed this action for declaratory relief.

On February 16, 2018, Morton answered the complaint and filed a counter-claim. [Doc. No. 8.]

## PERTINENT ALLEGATIONS OF COUNTER-CLAIM

Morton provides professional writing and consulting services. ¶10. Morton and Counter-defendant Boro have been friends for some 30 years. ¶11

On or around July 20, 2016, Slater initiated a meeting with Morton to discuss a book writing collaboration between the Parties (the "First Meeting"). ¶12.

Prior to the First Meeting, during a July 2016 teleconference with Slater, Morton advised that the usual fee for its services ranges from $150,000.00 to $300,000.00, depending upon the scope of work, plus equity of 25% or more of book sales. ¶14. Morton also advised Slater that consulting services are provided and billed separately from Morton's writing services. ¶15.

On or around August 15, 2016, the First Meeting took place and the Parties agreed to collaborate on writing a book about Defendant Slater's business memoirs (the "Book"). ¶16.

On August 16, 2016, Morton emailed Slater a standard collaboration agreement for Morton's services, with material terms of performance and compensation for the Book (the "General Agreement"). ¶17; Doc. No. 8-1.

On August 16, 2016, Slater agreed to pay $10,000.00 towards Morton's required $150,000.00 advance prior to the Parties' next meeting. ¶18.

On August 17, 2017 Morton emailed Slater its contract with the standard provisions and the specific agreed upon material terms concerning performance and compensation and reflecting Slater's $10,000.00 payment to Morton (the "Agreement"). ¶19.

Slater orally agreed to the terms of the Agreement, and promised to execute the written contract at the Parties' next meeting. Accordingly, an oral contract was formed under the terms of the Agreement. ¶28.

Subsequent thereto, Slater tendered $10,000.00 to Morton and arranged the Parties' second meeting in San Diego, California (the "Second Meeting"). ¶29.

On or around August 22, 2017, the Second Meeting took place and Slater proposed a different contract for Morton's services on the Book. ¶32.

Slater presented to Morton a six book collaboration deal that included an unspecified fee structure as well as a founding partner and majority shareholder position of a new content company to be named Potential, Inc. ("Potential"). ¶33.

Slater proposed that Potential's assets would consist of the material on which the Parties were contemporaneously working. ¶34.

Upon information and belief, Slater did not have funding for Potential. ¶35.

At Slater's request, Morton agreed to continue collaborating on the Book as previously agreed and afford Slater an opportunity to present agreement terms with a detailed and adequate fee structure for her current and potential future services. ¶36.

During August 2016 through October 2016, Slater emailed Morton communications regarding the development of Potential, paid for Morton's traveling expenses and arranged continued collaboration on the Book with promises of finalizing an agreement for Morton's current and future services. ¶42.

During August 2016 through October 2016, Morton continuously requested a written contract from Slater. ¶43.

On October 20, 2016 and October 25, 2016, Slater proposed a different offer (the "Offer") for Morton's services. ¶44.

The Offer proposed to reduce Morton's compensation to $75,000.00 for services on the Book, and equity in an unspecified number of shares in Potential, payable and vesting in increments based upon undated events for future services. ¶45; Doc. No. 8-3.

The Offer also proposed as compensation for Morton's future services a part-time officer role with an option to convert to a full-time position with the unformed business entity, Potential, for an unspecified salary. ¶46.

On October 26, 2016, Morton accepted the Offer in writing, and requested a written contract for memorialization. Thus, a second agreement was formed. ¶47.

On October 29, 2016, Counter-Defendant Watt acknowledged the written acceptance, by writing, "YES! SAW THE ACCEPTANCE!!!!!" ¶48; Doc. No. 8-4.

On December 9, 2016, Slater emailed Morton a Memorandum of Understanding (the "MOU") regarding the Offer, memorializing Morton's $75,000.00 fee for the Book payable in five increments and ten percent (10%) equity in Potential, vesting in thirds based upon performances subject to Slater's approval. ¶49.

On or around December 12, 2017, Morton emailed to Slater the MOU with edits (the "Edited MOU"), rejecting the fee payment structure, Slater's approval as a condition of payment, and the purported non-binding nature of the MOU. ¶50.

On or around December 13, 2016 through December 19, 2016, the Parties discussed the Edited MOU, with Morton again rejecting the proposed terms of MOU and making good faith efforts to negotiate an agreement between the Parties. ¶51.

On December 20, 2016, in an effort to reach a resolution, Morton emailed Slater a restructured performance time line for the Book and a contract reflecting terms of its standard 'middle of the road' deal. ¶52; Doc. No. 8-5.

Morton advised Slater that additional services would not be provided until a contract was executed and a payment received. ¶53.

On December 30, 2016, Counter Defendant Slater on behalf and with the authority of all Counter Defendants, unilaterally terminated the Book writing collaboration via email. ¶54; Doc. No. 8-6.

Based upon these allegations, Morton brings counter-claims for breach of contract, breach of the implied duty of good faith and fair dealing; unjust enrichment and fraud.

# DISCUSSION

A. Legal Standard.

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), to survive a motion to dismiss this short and plain statement "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action ....' " Id. (*quoting Twombly*, 550 U.S. at 555). Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In making this context-specific evaluation, this court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). This rule does not apply to "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), *quoted in Twombly*, 550 U.S. at 555, nor to "allegations that contradict matters properly subject to judicial notice," or to material attached to or incorporated by reference into the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001).

5

3:17-CV-1795-CAB-NLS

B. Fraud.

Slater argues the counter-claim for fraud should be dismissed because it fails to state a claim. [Doc. No. 12-1.]

Under Rule 9(b), a plaintiff who alleges fraud "must state with particularity the circumstances constituting the fraud," but may "allege [ ] generally" the state of mind animating the fraud. The pleading must "be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong *See Sanford v. Memberworks, Inc.,* 625 F.3d 550, 558 (9th Cir.2010) (*quoting Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir.2009)). To avoid dismissal, the complaint must describe the time, place, and specific content of the false representations and identify the parties to the misrepresentations. *Id.*

In addition, a plaintiff may not "lump multiple defendants together" but rather must "differentiate their allegations." *Destine v. Reiswig*, 630 F.3d 952, 958 (9th Cir.2011) (*quoting Cisneros v. Instant Capital Funding Grp., Inc.*, 263 F.R.D. 595, 606–07 (E.D.Cal.2009)). That is, plaintiffs must "inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir.2007). Moreover, "particularity" and "plausibility" are separate pleading requirements; a party raising a fraud claim must meet both. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 n. 3 (11th Cir.2010). Allegations may be "particularized," yet fail to state a "plausible" claim for relief. *See id.*

In California, a claim of fraud has five elements: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably and reasonably relied on the representation; and (5) the plaintiff suffered resulting damages. *Lazar v. Superior Court,* 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996).

Here, Morton has failed to state a claim for fraud. First, Morton fails to identify any specific false representations. In her opposition, Morton claims the

misrepresentations "related to the formation of Potential, Inc., and more specifically, [Morton's] compensation." [Doc. No. 16 at 3.] However, Morton does not specify what the representations were or why they were false at that time. *Sanford*, 625 F.3d at 558. Moreover, Morton does not specify which counter-defendant made the representation(s). *Destine*, 630 F.3d at 958. Finally, there are no discernable allegations of an intent to deceive. While Morton alleges that she was never informed of the progress of the formation of the company, and that counter-defendants took no active steps toward the formation of the company, Morton does not make any allegations that would show an intent to deceive versus a mere failure to perform. *Am. Dental Ass'n v. Cigna Corp*., 605 F.3d at 1293 n. 3. Therefore, Morton has failed to allege a plausible fraud claim.[1]

## CONCLUSION

For the reasons set forth above, the motion to dismiss the Fourth Counter-Claim for fraud is **GRANTED WITH LEAVE TO AMEND**. Morton may file an amended counter-claim by **May 18, 2018**. If no amended counter-claim is filed by that date, then Slater shall **answer** the existing counter-claim, as amended by this order, by **June 1, 2018**.

**IT IS SO ORDERED**.

Dated: April 30, 2018

Hon. Cathy Ann Bencivengo
United States District Judge

---

[1] The Court did not consider the request for judicial notice [Doc. No. 12-2] and therefore it is **DENIED AS MOOT.**